**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

——————————————————— :
FRANK R. ZOLLO,                     :
                                    : Civil Action No. 07-2584 (PGS)
          Petitioner,               :
                                    :
     v.                             :      **O P I N I O N**
                                    :
MICHELLE RICCI, et al.,             :
                                    :
          Respondents.              :
——————————————————— :

**APPEARANCES:**

Frank R. Zollo, <u>Pro Se</u>          Paula Cristina Jordao, Esq.
#282619/573572                    Morris County Prosecutor's Ofc
New Jersey State Prison           Admin & Records Bldg.
P.O. Box 861                      Morristown, NJ 07963
Trenton, NJ 08625                 Attorney for Respondents

**SHERIDAN**, District Judge

     Petitioner Frank R. Zollo, a prisoner currently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  The respondents are prison administrator Michelle Ricci and the New Jersey Attorney General.

     For the reasons stated herein, the petition must be denied.

**BACKGROUND**

**A.    Factual Background**

These facts are gleaned from trial testimony transcripts
which were submitted by Respondents along with their answer to
the petition.  The facts stated below are not all-inclusive, and
provide a summary for purposes of this habeas review.

Petitioner and the victim, Debra Smith Davis, had a
relationship which produced a child, named Amanda, in January of
1994.  On June 11, 1994, Petitioner struck Davis in the face,
resulting a black eye.  Davis secured a temporary restraining
order.  As a result of the incident, the Division of Youth and
Family Services ("DYFS") became involved with the couple and the
child.  Nancy Goebel, a social worker, spoke with Davis on June
14, 1994 and found her to be cooperative and coherent, and found
that the baby was being properly cared for.  The same day, Goebel
spoke with Petitioner, who lived with his mother at the time.
Petitioner told her that Davis had been involved with drinking
and drugs and was not properly caring for the child.

On June 20, 1994, Petitioner called Goebel asking her to
urge Davis to reconcile with him.  She refused to do so.  On June
28, Davis contacted her attorney asking to get the restraining
order dismissed.  The attorney dissuaded her from doing so.

On June 30, 1994, a family court hearing was held where a new restraining order was issued and an order for child support was entered.  After the hearing, Davis looked frightened.

The next day, on July 1, 1994, Petitioner and Davis and the child moved into an apartment together.  Five days later, Goebel attempted to contact Davis and was told that she had moved in with Petitioner.  Her attempts to locate Davis were unsuccessful.

On July 18, 1994, Petitioner began work at an automobile salvage, crushing, and recycling yard as a dismantler, stripping cars.  On his first day, he met David Rietzke, another dismantler.  The next day at work, July 19, 1994, Petitioner complained to Rietzke about Davis abusing their daughter and doing drugs, saying he was sick and tired of it.  He asked about the security at the yard and was told that there was a dog, but no cameras or guards.  Also that day, Petitioner called Goebel and told her he was going to a real estate class that night, and gave Goebel the couple's new address and consented to a visit the following night.

Petitioner's version of the facts is that on the evening of July 19, 1994, he returned from work and Davis was home.  He ate dinner while Davis watched television.  He then went onto the porch to smoke a cigarette.  Davis brought the baby outside for him to watch.  After about 20 minutes, he went back inside and saw Davis watching television.  He went to take a shower.  When

3

he returned from the shower, Davis appeared to be sleeping.  He attempted to wake her, but she was unresponsive.  He thought she had passed out from alcohol or drug consumption, and brought her to the bedroom.  After about an hour and a half, he observed that Davis's skin was blue and checked her pulse and heartbeat, but she was dead.

The State elicited testimony that the next day, July 20, 1994, Petitioner arrived at work and told Rietzke that he was sick and tired Davis and had "choked her out."  He told Rietzke that he had left her car near a crack house, and asked Rietzke what the procedure was for crushing cars.

That evening, Goebel arrived at the apartment for their visit.  Petitioner told her that Davis had left the previous night after an argument and had not returned.  Petitioner told her that she had probably gone for drugs.  Goebel suggested that Petitioner make some calls to try and find her, which he did, to no avail.  Goebel returned to the apartment the next day to follow up, but nobody answered the door.

Also on the following day, July 21, 1994, Petitioner went to work, wearing sneakers, and told Rietzke that he had brought Davis's body to the yard at about 2:00 a.m., and placed it in a car.  While he was doing so, he had ruined his work boots. Rietzke could not believe that Petitioner was serious, figuring Petitioner was just kidding around.

4

The next day, on July 22, 1994, Petitioner went to work and told Rietzke that he had moved the body to another car that was scheduled to be crushed that afternoon.  The car was crushed between 2:00 and 2:30 p.m.  As it was about to be crushed, Petitioner told Rietzke that if the trunk popped open, he was "out of here."  Later that day, Petitioner pulled a loaded gun on Rietzke and threatened him that if he squealed he would do the same to him as he did to Davis.

At this point, Rietzke became scared and began to believe that Petitioner had killed Davis.  He contacted the police, told them what had happened, and brought them to the car that Petitioner had said contained the body.  The body was found in that car, wrapped in comforters, a moving pad, plastic bags, and duct tape.

The county medical examiner examined the body, found it severely decomposed due to the hot weather, found a fracture in the chin and cheek and trauma to the left eye, and a fracture in the base of the skull.  He concluded that the cause of death was blunt trauma to the head.  He found no evidence of choking, but testified that he could not rule that out because of the advance state of decomposition.  Fingerprints taken from the body matched those of Davis.

That night, Lieutenant Gannon of the county prosecutor's office went to Petitioner's apartment, talked to him about

5

Davis's disappearance, then brought him to headquarters for questioning.  Petitioner continued to state that he and Davis had had a fight on July 19, and he had not seen her since.

At some point during the interview process, Petitioner told Gannon that he wanted to tell the truth and started to cry.  At that time he admitted killing Davis in the apartment.  He stated that he had "had enough" and choked her, with two hands, in the living room.  During the choking, they fell and Davis's head hit the floor.  He continued to choke her until she stopped moaning, then realized she was dead.  He admitted to covering her body with a blanket.  He then called his mother to come pick up the baby, which she did.  He told his mother that Davis was dead.  He "prepared" the body, moved Davis's car to a crack house, put the body into the trunk of his BMW, took his gun, and drove to the automobile yard.  He then transferred the body to the trunk of a Mercedes in the yard.

Also on July 22, 1994, Petitioner's apartment was searched, and a small cassette tape was found, which was admitted into evidence at trial and heard by the jury.  The tape contained evidence concerning the domestic violence charges, and a statement by Davis that she always left a message somewhere so that if she ever disappeared, "they know who to look for," and that she thought Petitioner would drag her into the woods and kill her.  She reminded Petitioner that she always told someone

of her whereabouts and Petitioner stated that they could say they dropped her off at a bar and she was missing.  Davis stated on the tape that her mother would never believe that.  A third conversation concerned Davis acquiring drugs and people wishing her a happy mother's day.

**B.    <u>Procedural History</u>**

In November of 1994, a Morris County grand jury indicted Petitioner.  In August of 1995, a superseding indictment was returned, which charged Petitioner with conspiracy to commit murder, contrary to <u>N.J.S.A.</u> 2C:5-2 (count one); murder, contrary to <u>N.J.S.A.</u> 2C:11-3a(1) (count two); hindering apprehension, contrary to <u>N.J.S.A.</u> 2C:29-3 (count three); and terroristic threats, contrary to <u>N.J.S.A.</u> 2C:12-3a (count four).  There were two additional counts concerning a co-defendant.

Petitioner was tried before a jury from April 22, 1996 to May 8, 1996 in the Superior Court of New Jersey, Law Division ("Law Division").  Petitioner was found guilty of murder (count two) and hindering apprehension (count three).  He was acquitted of conspiracy to commit murder and terroristic threats.

On June 27, 1996, Petitioner was sentenced to life imprisonment, with a 30-year period of parole ineligibility on the murder conviction, and a consecutive sentence of five years imprisonment, with a two and one-half year period of parole ineligibility on the hindering apprehension conviction.

Petitioner appealed the conviction and sentence to the Superior Court of New Jersey, Appellate Division ("Appellate Division").  The Appellate Division affirmed both on October 22, 1998, without a substantial written opinion.  On April 20, 1999, the New Jersey Supreme Court denied Petitioner's petition for certification.

In May of 1999, Petitioner filed a pro se petition for post-conviction relief ("PCR") in the Law Division.  The petition was denied on June 23, 2000, without an evidentiary hearing.  The Appellate Division affirmed the denial on April 5, 2002.  The New Jersey Supreme Court denied Petitioner's petition for certification on September 6, 2002.

Petitioner filed a second PCR petition, which, on May 6, 2003, was also denied by the Law Division without an evidentiary hearing.  On July 26, 2006, the Appellate Division affirmed the denial, and on October 19, 2006, the New Jersey Supreme Court denied Petitioner's petition for certification.

Petitioner filed this habeas petition on June 4, 2007.  On June 21, 2007, Petitioner was advised of his rights pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000).  An order to answer was issued and Respondents filed an answer to the petition on October 5, 2007.

Petitioner asserts the following claims in this habeas petition:

8

Ground One:    Trial counsel's failure to investigate and produce
               evidence at trial regarding defendant's mental
               diseases and defects deprived defendant of his
               right to effective assistance of counsel under the
               Sixth Amendment of the United States Constitution.

Ground Two:    Admission of the June 11, 1994 incident as other
               crimes or bad act evidence, pursuant to N.J.R.E.
               404(b), was improper and so prejudicially unfair
               as to have deprived defendant of a fair trial and
               due process of law as guaranteed by the Fourteenth
               Amendment of the United States Constitution.

(Petition, ¶ 12, Brief and Appendix in Support of Petition).   In

essence Petitioner's claims can be described as an ineffective

assistance of counsel claim, and a claim of trial court error.

It appears that the claims have been exhausted in the state

courts.   Nonetheless, this Court finds that Petitioner's claims

are clearly meritless.   Thus, the petition will be denied.[1]

## **DISCUSSION**

A.   **Standards Governing Petitioner's Claims.**

Section 2254 of Title 28, United States Code, provides that

the district court "shall entertain an application for a writ of

habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court only on the ground that he is in

_____

[1] Although a petition for writ of habeas corpus may not be
granted if petitioner has failed to exhaust his remedies in state
court, a petition may be denied on the merits notwithstanding
petitioner's failure to exhaust his state court remedies.   See 28
U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42
(3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir.
2003).

custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus.  The statute reads as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1).  The Court analyzed subsection 1 as two clauses:  the "contrary to" clause and the "unreasonable application" clause.  The Court held

10

that under the "contrary to" clause, "a federal court may grant
the writ if the state court arrives at a conclusion opposite to
that reached by [the Supreme] Court on a question of law or if
the state court decides a case differently than [the Supreme]
Court has on a set of materially indistinguishable facts." Id.
A federal court may grant the writ under the "unreasonable
application" clause, if "the state court identifies the correct
governing legal principle from [the Supreme] Court's decisions
but unreasonably applies that principle to the facts of the
prisoner's case." Id. at 413.  Habeas relief may not be granted
under the "unreasonable application" clause unless a state
court's application of clearly established federal law was
objectively unreasonable; an incorrect application of federal law
alone is not sufficient to warrant habeas relief.  See id. at
411; see also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000),
cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI
Albion, 171 F.3d 877, 891 (3d Cir.), cert. denied, Matteo v.
Brennan, 528 U.S. 824 (1999).  Thus, the federal court must
decide whether the state court's application of federal law, when
evaluated objectively and on the merits, resulted in an outcome
that cannot reasonably be justified under existing Supreme Court
precedent.  See Werts, 228 F.3d at 197; see also Jacobs v. Horn,
395 F.3d 92, 100 (3d Cir. 2005).

With regard to 28 U.S.C. § 2254(d)(2), a federal court must confine its examination to evidence in the record.  See Abu-Jamal v. Horn, 2001 WL 1609690 at *12 (E.D. Pa. December 18, 2001).  In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations.  See id.  Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness can be overcome only by clear and convincing evidence.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)(citing 28 U.S.C. § 2254(e)(1)).  "A finding that is well-supported and subject to the presumption of correctness is not unreasonable."  Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan, 156 F.3d at 198).

Furthermore, federal habeas courts ordinarily refrain from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review."  Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001).  A habeas petitioner therefore "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## B.  Ineffective Assistance of Counsel Claims

Petitioner claims that trial counsel "failed to investigate and produce evidence at trial regarding defendant's mental diseases and defects (mental health history)."  Petitioner argues that such evidence would have established a diminished capacity defense, corroborate defendant's testimony, and "negate essential features of the State's case."  Petitioner argues that counsel's failure to investigate and produce this evidence amounts to ineffective assistance of counsel under the Sixth Amendment.

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell

13

below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v. Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense.  See Strickland, 466 U.S. at 687.  Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.  See id. at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  See id. at 697; see also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

Petitioner raised ineffective assistance of counsel claims in his first and second PCR petitions.  In the first petition, citing Strickland, the PCR judge found that counsel was not ineffective (see Respondents' Exhibit 18T, June 15, 2000 transcript of PCR motion, at pp. 8-9, 13, 34), and the Appellate Division agreed, stating:

> In the absence of a presentation by defendant to establish what a reasonable investigation would have disclosed to cast substantial doubt upon the validity of the guilty verdict, or that a different view of the evidence would have engendered a different result, there is no basis for concluding that counsel at any level, including post-conviction relief counsel, provided inadequate representation.

(Respondents' Exhibit 18h (Opinion of Appellate Division, April 5, 2002)).

Petitioner raised the specific ineffective assistance claim that he sets forth in this petition, concerning his mental diseases and defects, in his second PCR petition.  In rendering her decision, the PCR judge stated:

> Okay.  I've reviewed through the - and gone through the steps of the time line here and I'm going to again make some additions to this, particularly in reviewing the first postconviction application.
>
> As I said, that application was made in May of 1999 and it contained the information that Judge Conforti [the first PCR judge] had both from the State and the defendant, and the defendant had counsel at the time.
>
> The application included many aspects of the ineffective assistance of counsel claim and he specifically; the defendant that is, submitted that he had advised [trial counsel] of his history of emotional disorders that would have established an explanation for his unusual reaction when confronted with an emergency situation.
>
> * * *
>
> . . . he submitted that his emotional disorder goes directly toward his unusual reaction when confronted with an emergency situation, a state of panic and fear, when he discovered that Miss Davis was deceased.
>
> * * *
>
> [Defendant] argued that [trial counsel] ignored investigating this disorder, although advised, and could not be said to be strategic; and that, therefore, he would - - the jury was deprived of hearing about the explanation for his conduct after he discovered Miss Davis was dead in the apartment.
>
> It was argued, as well, in front of Judge Conforti - - again, again, I just want to refer to those

16

documents.  There were four, five, six documents that
were presented.  They were letters from the
Neurological Institute 1972 about an examination.  A
1973 document about medication and evaluation.  Again,
asking to see [defendant] again in 1974.  From the
Bloomfield public schools, a psychiatric evaluation
being set up and – and that goes through 1979
indicating that there was – through the process, the
treatment as – for Mr. Zollo as a special needs child
in the system.

* * *

[Judge Conforti] said to [defendant's counsel on
first PCR motion], "These documents don't tell what the
emotional disturbance is.  There's no report about a
particular disturbance, how it would impact on his
conduct in terms of something he had been suffering
from.  It argues that he had an emotional disturbance
that would have explained his failure to report the
death in the particular case, the conduct in having the
body put into the trunk of the vehicle and then
crushed, as opposed to his asserting innocence as to
the murder allegation."

* * *

This brings me now to the second postconviction
relief proceeding that was filed in October of 2002.
At this time the documents and the petition contains
the additional information received from the school,
and it establishes, essentially, from 1973 through
1985, that [defendant] was in the Bloomfield school
system, and that he was early on classified, and again,
this is through the 70's, primarily, classified as
neurologically impaired and [as having] social
difficulties.

* * *

. . . It is certainly clear that there was no excusable
reason why the defendant had not otherwise obtained
documents he obtained in May of 1992, either before,
during that process.  Almost two years went by between
the decisions of Judge Conforti and the time those
documents were even requested.  So I conclude that the
second petition is untimely and barred, pursuant to the
rule, as being more than five years after the
conviction.

17

Even if I accepted and concluded that these documents should now be considered and not barred procedurally, the substantial equivalent of this issue was raised before Judge Conforti and previously adjudicated not just in the context of the documents that Judge Conforti had in front of him, because obviously we do now have, and accepting the information in – most favorably to [defendant], an actual diagnosis of a borderline personality disorder or social and impulse control issues, but the point, again, that Judge Conforti made that was made previously by counsel and even is made here again, is that this issue about personality and the diagnosis is not being submitted for the purposes of addressing the charge of the murder, but rather to explain his behavior in the manner in which he confronted the emergency, which is finding Miss Davis dead.

Again, in this regard, both Judge Conforti, and as counsel argued then, and I cannot conclude that that argument is – was inappropriate or not strategic, brings us to the point that even if this information provides a diagnosis, it is not otherwise relevant in the manner in which [defendant] has handled this trial and his innocence– alleged innocence through this time of the murder.

(Respondents' Exhibit, 19T, April 25, 2003 Transcript of second PCR motion).  The Appellate Division affirmed, stating that it was "in substantial agreement with the reasons for the decision [the second PCR judge] announced in disposing of the merits of the instant PCR application.  Defendant had established no adequate basis for an evidentiary hearing." (Respondents' Exhibit 18m, Appellate Division decision dated July 26, 2006).

After reviewing the record, this Court agrees with the findings of the state courts.  First, the evidence against Petitioner in this case was overwhelming, including the Petitioner's confession, the testimony of Rietzke, and the

statements made by the victim herself on tape.  Petitioner's counsel presented a solid defense including a forensic pathologist (who contradicted the State's cause of death), a detective in forensics (who testified regarding fingerprints), and Petitioner himself, who gave his side of the story. Petitioner's version of events conflicted with the events testified to by the State's witnesses.  Thus, the jury made a credibility assessment, found the State's witnesses more credible, and found Petitioner guilty.

Petitioner has not demonstrated deficient representation by counsel.  Additionally, Petitioner has not demonstrated that anything counsel could have done with regard to the alleged mental defects testimony would have changed the outcome of the proceedings or the serious nature of the offense.  Any evidence concerning Petitioner's mental defects or diseases, or state of mind after the death of the victim, would not change or challenge the fact of Petitioner's confession or Rietzke's testimony that Petitioner admitted killing the victim.  Thus, the outcome of the trial would not be different had Petitioner's evidence regarding mental defect or diseases been presented.  The jury would still have to make that credibility determination between the State's witnesses and the Petitioner's version concerning the actual killing.

Thus, for purposes of habeas relief, Petitioner has not shown, as required by 28 U.S.C. § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  The state courts correctly applied the <u>Strickland</u> federal standard to Petitioner's ineffective assistance of counsel claims, and reasonably applied the facts of the case in the decisions.  As a result, Petitioner is not entitled to habeas relief for his ineffective assistance of counsel claim.

C.   **Trial Court Errors**

Petitioner argues that the trial court improperly admitted into evidence a domestic violence incident that occurred on June 11, 1994.  Petitioner argues that the incident had been dismissed; however, the trial court instructed the jury that Petitioner had a court judgment "against him" for domestic violence.  The prior judgment also involved the victim in the murder for which Petitioner was on trial.

During trial, the detective involved in the June 11, 1994 incident testified, as did Petitioner.  Petitioner testified that on June 11, 1994, he had an argument with the victim and hit her

in the face, resulting in the victim's black eye.  A restraining order was entered, and was eventually dismissed after Petitioner appeared in court.  (Respondents' Exhibit 13T, Transcript dated May 3, 1996, at pp. 120-125).

Prior to the June 11, 1994 incident being raised at trial, the trial court held a pretrial hearing to determine the admissibility of the evidence under N.J.R.E. 404(b).  The trial court concluded that the evidence was admissible to show motive and to show the theory of the crime.  The trial judge noted that he would "instruct the jury as to its limited use."  Petitioner's counsel was present and argued that the evidence be held inadmissible during this hearing.  (Respondents' Exhibit 7T, Transcript of April 25, 1996, at pp. 193-94).

The trial court charged the jury:

> You have heard evidence in this case that the defendant Frank Zollo was previously convicted of a criminal offense.  And this evidence may only be used in determining the credibility or believability of his testimony.  You may not use the prior conviction to show that because he committed a criminal offense on another occasion, there, he may – he may have or did in fact commit the crime charged in this case.
>
> A jury has a right to consider whether a person who has previously failed to comply with society's rules as demonstrated through a criminal conviction would be more likely to ignore the oath regarding truthfulness on the witness stand than a law abiding citizen.  You may consider in determining this issue the nature of the prior conviction and when it occurred.  Remember, our law permits a conviction to be received in evidence only for the purpose of affecting the credibility of the defendant and for no other purpose.  You are not, however, obliged to change your

21

opinion as to the credibility of the defendant simply
because of a prior conviction.  It is evidence you may
consider along with all the other factors we previously
discussed in determining the credibility of a witness
in this case, the defendant.

(Respondents' Exhibit 16T, Transcript dated May 8, 1996, at pp.

45-46).[2]

Petitioner raised this issue on direct appeal.  The

Appellate Division concluded:

. . .  The trial judge's instruction to the jury on its
use of "other crimes" evidence inadequately defined the
contours of the permitted and prohibited uses of the
evidence as required under [New Jersey case law].
However, since defendant did not object to the jury
instruction, the plain error standard is applicable.
Because the use of other crimes was not interdicted
altogether (that evidence was admissible on the issues
of motive and intent) and because defendant admitted to
the murder, we are satisfied that any imprecision in
the instruction was not capable of producing an unjust
result or of leading the jury to a determination it
might not otherwise have reached.

(Respondents' Exhibit 18c, Appellate Division opinion dated

October 22, 1998).

Petitioner's claim raises a challenge to state law

concerning admission of evidence and jury charges.  However, a

state's misapplication of its own law may constitute a violation

of due process only in "rare" cases.  See id. ("when that

misapplication has the effect of depriving a person of life,

_____

[2]  The Court notes that Petitioner testified that at the
time of the killing, he was on probation after a conviction for
distribution of marijuana.  (Respondents' Exhibit 13T, Transcript
of May 3, 1996, at pp. 138-139).

22

liberty, or property without due process of law in violation of
the Fourteenth Amendment, the resulting federal constitutional
error can be corrected by a federal habeas court").  Evidentiary
rulings may violate due process when the petitioner "was denied
fundamental fairness at trial." Hutchins v. Hundley, 1991 WL
167036 at *4 (D.N.J. Aug. 22, 1991)(Wolin, J.)(citations
omitted); see also Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir.),
cert. denied, 513 U.S. 881 (1994); Lisenba v. California, 314
U.S. 219, 228, 236 (1941)(holding that state court's evidentiary
rulings may form the basis for habeas relief when they "so
infused the trial with unfairness as to deny due process of
law").

The appropriate inquiry is "whether the claimed error of law
is a fundamental defect which inherently results in a complete
miscarriage of justice or in an omission inconsistent with the
rudimentary demands of fair procedure." Hutchins, 1991 WL 167036
at *4 (citing United States v. De Luca, 889 F.2d 503, 506 (3d
Cir. 1989), cert. denied, 496 U.S. 939 (1990))(other citations
omitted).  The Supreme Court has further stated that "an
otherwise valid conviction should not be set aside if the
reviewing court may confidently say on the whole record that the
constitutional error was harmless beyond a reasonable doubt."
Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  An error is
not harmless if "it aborts the basic trial process or denies it

altogether." Hutchins, 1991 WL 167036 at *5 (citing Rose v.
Clark , 478 U.S. 570, 578 n.6 (1986)).

Applying these principles to the instant case, this Court
finds that Petitioner's case is not the "rare" instance where
evidentiary rulings have violated his rights to due process.  A
review of the whole record demonstrates that the trial process
was fundamentally fair.  Petitioner's counsel was present and was
available to cross-examine and present evidence to support
Petitioner's case, at both the pretrial hearing regarding the
June 11 incident, as well as at trial.  As noted, the evidence
against Petitioner was overwhelming, and the jury was required to
make a credibility determination as to which story to believe:
the State's or the Petitioner's.  This Court is confident that
the jury made that finding based upon a fair assessment of the
testimony.  The admission of the June 11 evidence, as well as the
limiting jury charge, while "inadequate" under New Jersey state
law, did not amount to a due process violation.  The trial was
not fundamentally unfair as to warrant habeas relief.

Petitioner has not demonstrated that the actions of the
state courts "resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States," or "resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence

24

presented in the State court proceeding." Accordingly, this ground for a writ of habeas corpus will be denied.

## **CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, is denied. The Court further finds that no certificate of appealability will issue because Petitioner has not made a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253.

An appropriate Order accompanies this Opinion.


_____
PETER G. SHERIDAN
United States District Judge

Dated: